# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**GLEN R. VASA**,                                          Chapter 7
        Debtor                                          Case No. 14-12324-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DANIEL M. HUTTON**,
        Plaintiff,
v.                                                      Adv. P. No. 14-1173
**GLEN R. VASA**,
        Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by Daniel M. Hutton (the "Plaintiff" or "Hutton") against Glen R. Vasa (the "Debtor," the "Defendant" or "Vasa"). The Court conducted a trial on December 7 and 8, 2015 and, at its conclusion, directed the parties to submit proposed requests for findings of fact. The issue presented is whether the Plaintiff sustained his burden of proof that certain obligations allegedly owed to him by the Debtor are nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4) or (a)(6).

1

## II. BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on May 8, 2014.[1]  On amended

Schedule B-Personal Property, the Debtor listed interests in two law firms to which he

ascribed no value:  Vasa & Hutton LLC [sic] located at 6 Cabot Place, Unit 8, Stoughton,

Massachusetts 02072, and the Law Office of Glen Vasa, P.C. located at 1106 Main Street,

Suite 102, Brockton, Massachusetts 02301.  The Debtor did not disclose interests in either

Platinum Merchants Solutions or Grand Realty Group, Inc. because, as he testified,

neither entity made any profits. On amended Schedule E-Creditors Holding Unsecured

Priority Claims, the Debtor reported no tax obligations.   On amended Schedule F-

Creditors Holding Unsecured Nonpriority Claims, he listed the Plaintiff as the holder of

a claim in the sum of $60,000.00.  On amended Schedule I-Your Income, he disclosed

"gross wages, salary, and commissions" from employment at "Vasa & Hutton" in the

monthly amount of $2,791.00, but, at trial, he testified: "that might have been in error"

and "that would have been an estimate."  In addition, although the Debtor revealed in

his testimony that he has two children, he indicated that he had no dependents on

Schedule I.

On July 25, 2014, the Chapter 7 Trustee filed a Report of No Distribution.  On

August 26, 2014, the Court entered an order of discharge.  On August 25, 2014, however,

---

[1]  The Debtor's Schedules and Statements were submitted into evidence as an exhibit.
Moreover, the Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In
re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The
bankruptcy court appropriately took judicial notice of its own docket.").

the Plaintiff timely filed a Complaint under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).  The
Plaintiff, however, did not set forth separate counts in his Complaint.

At the trial, four witnesses testified, including the Plaintiff and the Debtor, and 15
exhibits were admitted into evidence.  The Court now makes its findings of fact and
rulings of law in accordance with Fed. R. Bankr. P. 7052.

## III. FACTS

Both the Plaintiff and the Debtor testified that they were equal stockholders of a
Massachusetts professional corporation, not a limited liability company, incorporated as
the law firm of Lipis, Vasa and Hutton P.C., although the Articles of Organization were
not introduced into evidence. The name of the professional corporation was never
changed, but after the disbarment of Attorney Jay Lipis ("Lipis") the firm's letterhead
was changed to Vasa & Hutton, P.C. ("V & H" or the "firm") at the insistence of the
Massachusetts Board of Bar Overseers.  Vasa and Hutton purchased the personal injury
law practice from Lipis in 2006 for $1,000,000.00.   Lipis provided purchase money
financing, but few details about, or documents pertinent to, the terms of the purchase and
sale were introduced into evidence.

Jeffrey Cohen ("Cohen"), an attorney with a master's degree in taxation from
Boston University, served as the firm's accountant from its inception.  In his words, he
was the attorney for both Lipis, on the one hand, and Vasa and Hutton, on the other,
regarding the purchase and sale of the Lipis's personal injury practice to Vasa and Hutton
in mid-2006.  In subsequent years, Cohen, working for V & H, did the payroll tax returns,
the corporate tax returns and "the individual tax returns for both partners." Thus, Cohen

prepared all Form W-2s and Form W-3s for V & H and was aware of the firm's financial health and eventual cash flow problems.

Hutton testified that V & H was a partnership, but then immediately retracted that contention insisting it was a professional corporation. The agreement to purchase the law practice required Vasa and Hutton to make bi-monthly payments to Lipis in the sum of $6,000.00. V & H also made monthly rental payments to Lipis in the sum of $2,100.00 either because he was the firm's landlord or he was the signatory on the lease for the firm's premises. In addition, Hutton made his home in Lipis's personal residence, paying him rent for the space he utilized. In accordance with the purchase agreement, V & H paid Lipis $6,000.00 every two weeks until mid-2012 when Lipis agreed to reduce the amount of the bi-monthly payments from $6,000.00 to $4,000.00 and also agreed to a principal reduction of $60,000.00, leaving an outstanding principal balance of $135,000.00. In the year 2012 alone, V & H paid Lipis approximately $140,000.00 toward the purchase price for the law practice and rent.

Both Vasa and Hutton testified that they were equal and sole shareholders of the professional corporation, although they frequently referred to themselves as partners during the trial. In 2012, the firm had five employees, as well as an associate, William Serwetman, Esq., and a payroll of approximately $156,000.00 per year, excluding distributions taken by Vasa and Hutton. They had a verbal agreement to share the firm's profits on an equal basis, although between 2006 and 2013, Vasa took $66,900.000 more in distributions from V & H than Hutton. The following chart summarizes the amount of income each received.

4

| Year | Hutton | Vasa |
|------|--------|------|
| 2006 | $15,317.50 | $15,317.50 |
| 2007 | $86,000.00 | $86,000.00 |
| 2008 | $88,000.00 | $70,000.00 |
| 2009 | $20,000.00 | $18,000.00 |
| 2010 | $ 6,000.00 | $ 9,000.00 |
| 2011 | $12,000.00 | $25,500.00 |
| 2012 | $ 3,000.00 | $63,000.00 |

Hutton testified that, although he withdrew more income from the firm in 2008 than Vasa, it was because Vasa chose not to cash checks that year, presumably because of the death of his father.  The level of income received by Vasa and Hutton between 2009 and 2012 is difficult to understand, and Hutton's income from the firm, at least in 2010 and 2012, was insubstantial. The business account for V & H reveals, however, that the firm made sizeable payments to American Express in 2011 in the approximate amount of $50,000.00 and in 2012 in the approximate amount of $65,000.00. There was no testimony as to who was authorized to use the American Express credit card or about the purposes for which its use was authorized.

With respect to liabilities, Vasa, in his post-trial Request for Findings of Fact, admitted that he and Hutton are "jointly and severally liable for the Corporation's debt." Hutton, however testified that "[t]here was always an assumption that the corporation would have enough money so we didn't - - so we believed ultimately all expenses would be paid, so there was no gentlemen's agreement with regards to who would incur what liability if expenses weren't paid." He further indicated that he did not meet with Vasa regularly to review either the firm's revenues or its expenses.

Hutton and Vasa divided the duties incident to operating their personal injury law firm. Hutton focused on litigation and settlement activities with respect to the firm's personal injury clients, while Vasa managed the office staff and kept the firm's books. His duties included managing the firm's IOLTA [Interest on Lawyer Trust Accounts] checking account and the firm's business checking account. Although both Hutton and Vasa had access to the the firm's IOLTA and business operating accounts, only Vasa had the ability to transfer funds electronically from the firm's IOLTA account to its operating account. Moreover, the firm's check books were kept in an unlocked safe next to Vasa's desk in his office. In addition, one of V & H's employees, Jenny Rosa, sometimes wrote checks for Vasa's signature and kept the office ledger. Portions of the ledger were introduced into evidence. In many instances, the hand written ledger entries are difficult to decipher.

The bank statements for the the IOLTA account and the operating account unequivocally establish that Vasa was the managing partner of V & H as he had control over the firm's finances. A comparison of the online transfers from the IOLTA account to the firm's operating account with the total deposits into the operating account as reflected on the bank statements for both the IOLTA and operating accounts establishes that the primary source, if not the sole source, of funds for the firm's operations resulted from online transfers from the IOLTA account to the business account. Only Vasa was able to make those online transfers. Hutton wrote just 4% of the 1,255 checks issued by V & H from the firm's operating account that were submitted into evidence for the period between November 2010 and September 2013. Moreover, the checks and electronic funds

transfers from the firm's business account confirm that tax obligations were not paid regularly in April, June, September, and January, despite evidence of checks made payable to Cohen for his services as an accountant.

Hutton testified that in 2011, the year in which he received $12,000.00 in income and Vasa received $25,500.00 in income, he was approached by Vasa to discuss the financial condition of the firm. According to Hutton, "[t]he conversation dealt with the fact that we had become behind on taxes and we both had to take out personal loans so that cash could accumulate in the corporation so we could start paying off these taxes." As a result of information provided to him by Vasa, Hutton testified that he obtained a $50,000.00 loan from his father and ceased withdrawing money from the firm. He testified, however, that he did not rely on Vasa's statement that the money would be used to pay off tax obligations, but rather on Vasa's previous $10,000.00 loan to V & H. Hutton stated: "[s]ince he gave us [sic] the loan, I thought he was above reproach and I had no reason not to trust him."

With respect to Hutton's loan, the parties agreed to a number of exhibits including the firm's bank statements for its operating account and its IOLTA account. Neither the business bank account statements for V & H for the period from November, 2010 to September, 2013 nor the IOLTA bank account statements for the same period show a $50,000.00 deposit in 2011 or in early 2012. Notably, the business account at Rockland Trust bears the name "Law Offices of Lipis Vasa & Hutton PC," although Lipis had been disbarred. The IOLTA account at Rockland Trust continued to bear the name "Law Office

of Lipis Vasa Hutton PC" until some time after October 31, 2011 and before November 30, 2011.

Vasa, who had previously lent the firm $10,000.00 in 2009, did not obtain any loans to shore up the firm's finances in 2011 or 2012. Hutton indicated that he "did not really look at the books on a regular basis" because he did not anticipate receiving any income from the firm in 2012. Accordingly, Hutton testified that he was unaware that Vasa took distributions totaling $63,000.00 in 2012.

Vasa testified about the need for a loan as follows:

I don't believe I had the conversation about a loan. I had -- Hutton and I had conversations at various points about how the financial viability of the office at different points with respect to if we did all the taxes or if we had to make payment to Mr. Lipis or if we had to make payments to other things. I -- and the only time I ever spoke to Mr. Hutton about anything regarding a loan would have been in the context of our business loan because I do remember when Mr. Hutton told me he knew somebody that worked for a bank that could potentially -- so he was going to look into potentially getting some type of assistance for our business to help perhaps pay off the -- by the tax -- tax – we owed stuff to taxes at certain points, but we also owed some to Mr. Lipis. I obviously was more concerned with -- if we had obligation for the taxes, but there was -- the only time I remember ever him mentioning any type of application with Mr. Hutton was there was a company that would give law firms loans based on the case -- amount of cases you had in inventory. So there was a potential of that but we never went through with it. We never even submitted the application . . .

Hutton testified that 2012 was a pivotal year for him and the firm. He indicated that he was required to travel to Europe for personal reasons in mid-2012. In addition, upon his return, on October 25, 2012, his birthday, he received a "rather frantic" telephone call from Cohen who indicated that "we had to go down to the IRS immediately because the taxes hadn't been paid."

Hutton represented that he was "shocked things hadn't been paid because I hadn't been taking any money out," adding that "at that time I began investigating what was going on, the finances of the firm."  In October of 2012 when Hutton learned about the firm's tax problems and began investigating the operation of the office and obtaining bank statements and records, he learned that "[t]here wasn't a single book that had all the bank statements in it from previous years."  Hutton stated that his investigation revealed that Vasa had neither ceased taking money from the firm nor infused money into the firm by way of a personal loan.  Rather, Vasa had taken considerable sums from the firm, and the firm had incurred significant debt for payroll and unemployment taxes.  More significantly, according to Hutton, client funds had been taken.  Hutton determined that Vasa had transferred money from the firm's IOLTA account to the firm's business operating account and then taken income from the operating account.

Hutton identified two of the firm's cases where there were insufficient client funds in the IOLTA account to satisfy clients' claims:  a case involving Maria Street Baptiste ("Baptiste"), who was owed $13,333.00, and a case involving David Lubwama ("Lubwama"), who was owed $13,587.17.[2]  The Board of Bar Overseers is investigating Hutton and Vasa with respect to both matters.

---

[2] Hutton admitted that "[a]s an Officer of the Corporation the Plaintiff is liable to both clients along with the Defendant," adding that the Defendant is "asking the Court to discharge these debts."  The Court, observes, however, that neither Baptiste nor Lubwama are listed on the Debtor's amended Schedule F.

With respect to the Lubwama case, in particular, Hutton, referencing the July 1, 2012 Rockland Trust IOLTA account statement (Plaintiff's Exhibit 4), testified that he settled the case and the settlement check was deposited in the IOLTA account. According to Hutton, Lubwama's share of the settlement proceeds, as noted above, was $13,587.17. Because Lubwama, disgruntled about the settlement, never picked up a check for his share of the settlement, the IOLTA account should never have had funds on deposit in an amount less than $13,587.17. Despite the need to maintain at least that sum in the IOLTA account for Lubwama to pay his share of the settlement, the account balance fell below $13,000 in July of 2012 at a time when Vasa was causing online transfers to be made from the IOLTA account to the firm's business account and withdrawing significant sums from the business account in view of the firm's financial condition. Specifically, Vasa paid himself $9,000.00 in May, 2012; $2,250.00 in June, 2012; and $6,750.00 in July, 2012 when the IOLTA account balance was $12,564.95.

Vasa testified that the Lubwama case was "exclusively handled by Mr. Hutton." He explained the office procedure when a case was settled, stating:

> Once the case settles and the client has signed the release, the file -- you know, it sits in the file cabinet in the copy room waiting for the check to come in. And then once the check comes in the client signs the check and it's deposited into their IOLTA and the file will sit next to the office manager in her cabinet. It will sit with every other file while we're waiting for -- while clients are owed money. It will stay there until the clients are paid the money that they're owed and then the file will be closed out and put into the storage area.

According to Vasa, "[i]f the money was received and deposited into our client account and the client had not yet been paid the money, the file should be in the -- the file cabinet

that sits right next to the office manager who would monitor those files . . . ." Vasa added

that he did not know where the Lubwama file was although he stated that at least at one

point Hutton had it in his office. Vasa did not dispute that the settlement check received

for the Lubwama case was deposited into the IOLTA account.

With respect to transfers from the IOLTA account to the business account, Vasa

admitted that he failed to keep accurate records for each client of the firm, resulting in

disciplinary proceedings with the Board of Bar Overseers. He stated:

> [T]ypically what I would do and obviously it's not the best recordkeeping,
> but I'd have to do basically a reverse reconciliation based on -- I could check
> to see how much was in the IOLTA account at any given time just by
> looking online quickly and easily and then I could – I would know what's
> in the file cabinet next to Jenny, the office manager. I would know what
> cases we had, where money was still owed to clients so I could quickly and
> easily calculate what money was still owed to clients and the difference
> would be in the money that was owed to the office. So obviously, we should
> have had a better reconciliation method by  . . .

In other words, Vasa relied exclusively upon the presence or absence of a file in the file

cabinet next to the office manager's desk. He testified that he had a system which

prevented him from transferring "like the full -- you know, the one-third from the case,"

adding that "[i]t would be a random number because it wouldn't be 100 percent sure as

to any specific amount." He explained that his system did not work because Lubwama's

file was not in the correct place and he did not know the amount due Lubwama. With

respect to the online transfer totaling $55,000.00 reflected on the July 1, 2012 IOLTA

account statement he observed, inaccurately, that $55,000.00 was approximately one-

third of the money paid from the account according to the July 1, 2012 statement

($79,733.93 + $55,000.00 =$134,733.93 ÷ 3 = $44,911.31).

11

In addition to his discoveries about nonpayment of taxes and problems with the IOLTA account, Hutton testified about Lipis's involvement with the firm during his absence which resulted in disciplinary proceedings against him before the Board of Bar Overseers.  Vasa, Hutton, and Cohen had a meeting about "hiring" Lipis to settle cases in the summer of 2012 at about the same time Lipis agreed to accept reduced bi-monthly payments.  Cohen expressed reservations about permitting Lipis to return to the firm, but, according to Vasa, Lipis assured them of the following:

> [H]is attorney, Paul Epstein, who was representing with the BBO [sic] had gotten assurances from Linda Bauer, the BBO [sic], that while he was not reinstated as an attorney he could do work within our office up to that point of being -- you know, whether it was administrative or -- I forget exactly what the term was for, but that's what he had assured us from the initial point is that he had that permission from his attorney.

When Hutton returned from Europe, Lipis was working in the office.  Hutton testified as follows:

> I asked Mr. Vasa if we had BBO approval for him to work there as a volunteer. I was told yes. That was not true. Took me two months to figure that out. And I did throw Lipis out of the office when I found out that Mr. Vasa had offered him paid salary, which everybody knew Mr. Lipis could not receive. And at the same time I found out that Mr. Vasa was intending to use Mr. Lipis for voice shots [sic] to our former clients and the BBO had previously told us under no circumstances is Lipis's name to be associated with the firm.
>
> As a result, at that point I figured out Vasa had lied to me about Lipis having a right to be there. As a result, the BBO filed charges against me and that incurred quite a legal bill defending my fees -- I mean, my license. And I believe that amount went up to $30,000. And had Mr. Vasa been honest with me, I would not have had Lipis there and I would not have incurred that loss.

With respect to tax liabilities incurred by V & H for failure to satisfy payroll and other tax obligations to the United States Treasury (the "IRS") and the Massachusetts

Department of Revenue (the "MDOR"), Hutton introduced exhibits setting forth amounts due to taxing authorities, including a Payment Agreement with the MDOR, which he signed on November 24, 2015, reflecting a $20,838.10 liability for withholding taxes for the period from March 2013 through September 2014; a Judgment by Default obtained by the MDOR in the sum of $63,587.34, dated November 6, 2015; a Notice of Certified Assessment, dated September 23, 2015, in the sum of $14,425.88 pertaining to unemployment insurance contributions, unemployment health insurance contributions, and workforce training fund contributions; a MDOR Notice of Lien, dated September 23, 2015, setting forth an amount due of $69,759.68 for various quarters beginning with the third quarter of 2006 through the second quarter of 2012, plus $125.00 in penalties from 2014 and the first quarter of 2015; and an IRS Notice of Levy, dated September 2, 2015, in the sum of $13,805.88 on Hutton's personal bank account for the tax liability of V & H, which Hutton paid. According to Hutton the IRS has not been paid for payroll taxes for the first quarter of 2014, which total $15,385.52, or for the second quarter of 2014 which have not been assessed.

Vasa, in his defense, testified that he always gave Cohen accurate monthly payroll figures and never attempted to conceal the firm's financial condition from Hutton. He also testified that Hutton had check signing authority with respect to the firm's operating account and access to the firm's ledger. In addition, he testified that V & H never outlined their individual fiduciary duties, adding, in his proposed findings of fact, that "Hutton had a fiduciary duty to Vasa and the IRS not to Lipis yet Hutton chose to pay Lipis rather

13

than the the IRS or Department of Revenue." Vasa added that he and Hutton had made

a collective decision to stop paying Lipis, but that decision was not implemented.

With respect to the tax obligations of V & H, Vasa admitted that he is jointly

obligated to pay the taxes. He testified that payroll taxes were not paid in late 2011 or in

October of 2012, and that in 2013 the firm was "behind on a couple of quarters."[3]  Hutton

testified as follows:

> If somebody had wanted to, yes, but that had been Mr. Vasa's duty at that
> time because I was doing the litigation, et cetera. So had he chosen to write
> them taxes [sic] he could have.  If you noticed, most of those checks that
> you showed were signed by Mr. Vasa. I did Lipis's, because in part Mr.
> Vasa and Mr. Lipis had a severe fight and feud and Mr. Vasa refused to sign
> any check over to Mr. Lipis at that time. So he would sign the checks for
> everybody else on that payroll session, but he wouldn't sign Lipis's. I had
> to sign it because of their feud.

Vasa, testified he was unable to obtain information from Cohen and Hutton was not

authorized to make a payment agreement on behalf of V & H.

Although both Vasa and Hutton emphasized the status of V & H as a professional

corporation, as noted above, neither submitted the Articles of Organization, the bylaws

of the corporation or any shareholder agreement between them.  Accordingly, although

---

[3] *See* 26 U.S.C. § 6672. *See also* <u>Lubetzky v. U.S.</u>, 393 F.3d 76, 78 (1st Cir. 2004)
("Employers are required to deduct from employee wages-and turn over to the Internal
Revenue Service-social security, Medicare and federal income taxes. Although the
primary liability for failing to do so is the employer's, a penalty for such a failure equal
to the unpaid tax can be collected from '[a]ny person' who was 'required' but 'willfully'
failed to pay over the withheld taxes. I.R.C. § 6672 (2000); <u>Slodov v. United States</u>, 436
U.S. 238, 250, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978). Such persons are described in the case
law as 'responsible persons' and a body of decisions has refined the concept, albeit
imperfectly. *See* Mertens, *Law of Federal Income Taxation* §§ 55:107-:113 (1997 & 2004
Supp.).") The Commonwealth has similar provisions with respect to certain corporate
tax obligations.

the parties testified about the division of labor in the firm, there was no evidence as to the

formal roles they were to play or the duties they were to perform pursuant to corporate

governance documents.   Moreover, there was no evidence that Hutton and Vasa

observed corporate formalities by holding annual meetings or voting on firm matters.

Although Hutton and Vasa agreed to share profits equally, they had no express

understanding as to the payment of liabilities.  The Court, therefore, must infer that each

would assume an equal share of the liabilities, consistent with their stock ownership and

and their testimony that each is jointly and severally liable for the debts of V & H.  Hutton

and Vasa thus operated the firm as a partnership, albeit a loose one, as both looked

beyond the firm's personal injury practice to generate other sources of income.  Vasa

admitted forming two corporations, Platinum Merchants Solutions and Grand Realty

Group, Inc., while Hutton established a criminal and divorce practice.  Vasa's failure to

disclose his interests in those entities on amended Schedule B, as well as other deficiencies

in his Schedules and Statements, which he executed under penalty of perjury,

undermines his credibility with this Court.

Although Hutton and Vasa continued to withdraw money from the firm in 2013,

$7,900.00 in the case of Hutton and $18,300.00 in the case of Vasa, payroll taxes were not

paid in full.  Hutton did not communicate with Vasa about the payment of taxes, stating

"[i]t was a waste of my time to talk with Mr. Vasa at that point." Indeed, in 2013, the

parties initiated discussions, through their respective attorneys, about the dissolution of

the professional corporation. Additionally, Hutton testified that he filed a complaint

against Vasa with the Board of Bar Overseers.[4]  He stated:

> The taxes were filed in 2013 and '14. Mr. Vasa simply walked away from
> the firm. He wouldn't talk with Mr. Cohen and I had to deal with
> everything. And Mr. Cohen and I had to get records from the IRS to put
> everything together because all the business records had been taken from
> the office. That's why that was done and I paid Mr. Cohen out of my own
> pocket to put these things together. And that's the only reason why we're
> able to come up with a payment plan with the Department of Revenue
> because they wouldn't deal with me until this paperwork was submitted.
> Now, when I say "paperwork," I mean the tax paperwork. We had to have
> the corporate filings for 2013 and '14 and I paid the filings for that also.

## IV. DISCUSSION

As noted above, the Plaintiff's Complaint does not contain separate counts under

11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).  Hutton set forth a litany of accusations against

---

[4] The Court, subject to the parties' opportunity to comment, takes judicial notice of the
Disciplinary Decisions of the Board of Bar Overseers because both Hutton and Vasa
testified about disciplinary proceedings against them and Lipis.  There are four decisions
relating to Jay Lipis, 18 Mass. Att'y Disc. R. 369 (2002), 24 Mass. Att'y Disc. R. 431 (2008),
28 Mass. Att'y Disc. R. 559 (2012), and 31 Mass. Att'y Disc. R. ___ (2015), and one relating
to Hutton, 31 Mass. Att'y Disc. R. ___ (2015), set forth on the website of the Board of Bar
Overseers,  (http://www.mass.gov/obcbbo/decisions).   As noted by the hearing
committee, bar counsel filed a petition for discipline against Hutton, Vasa and Lipis,
charging that they "impermissibly assisted and allowed Lipis, a suspended attorney, to
engage in the practice of law in their firm; that they failed to supervise him or make sure
that measures were in place to assure that his conduct complied with their ethical
obligations; and that they allowed him to use a false name and to misrepresent himself
as an attorney." Hutton received a public reprimand on December 23, 2015. As Vasa
testified, the case against him is still pending.
    The Court finds that it may take judicial notice of these records. *See*
Massachusetts v. Westcott, 431 U.S. 322, 323 n.2 (1977)(citing Bowles v. United States,
319 U.S. 33 (1943), Tempel v. United States, 248 U.S. 121 (1918), Jones v. United States,
137 U.S. 202 (1890), and Fed. R. Evid. 201(b)("A judicially noticed fact must be one not
subject to reasonable dispute in that it is . . . capable of accurate and ready
determination by resort to sources whose accuracy cannot reasonably be questioned").

Vasa, but did not effectively align those accusations with the elements of claims under 11

U.S.C. § 523(a)(2)(A), (4) and (6) in either his Complaint or the parties' Joint Pretrial

Memorandum.[5]  Moreover, certain factual statements made by Hutton in the parties'

Joint Pretrial Memorandum were unsupported by evidence introduced at trial.  Not only

---

[5] For example, in the Joint Pretrial Memorandum, Hutton set forth his position as follows:

> The Plaintiff alleges in his claim seeking a denial of the Discharge of all claims arising from the claims asserted by the Plaintiff against the defendant in the Norfolk Superior Court case known as <u>Hutton v. Vasa</u>, 2014-000665, pursuant to 11 U.S.C. § 523 (a) (2), (4) and (6) for obtaining money by fraud, false representation; fraud while acting in a fiduciary capacity (by misappropriating money's from the firm's IOLTA account) and for willful and malicious injury to another entity and the property of another entity.

> The Plaintiff relied, to his detriment, on the Defendant's statement that the corporation known as Vasa & Hutton, PC was in financial trouble and both partners would have to take out loans to pay the debts of the corporation.

> After the Plaintiff transferred the funds into the corporation, the defendant took about $63,000.00 for his own personal use in developing his real estate company.

> The Plaintiff, who was entitled to 50% of the income during that period, only took out $3000.00 in reliance on the Defendant's assertions that the company was in financial trouble.

> The Defendant breached his fiduciary duty to the client of the Corporation by taking $13,587.14 from the Client's funds held in the corporation's IOLTA account; and

> The defendant caused willful and malicious harm to both the Plaintiff and the Plaintiff's 50% share of the corporation by using the money the Plaintiff had loaned to the corporation for his own personal use and by taking money from the Client funds account for his own personal use.

did Hutton fail to introduce into evidence or testify about his state court complaint, there was no evidence that Vasa withdrew funds from V & H for developing his real estate company instead of using them for living expenses. Hutton focused on the disparity in monies withdrawn from V & H by the partners in 2012, without establishing that V & H was profitable. In addition, at trial, he testified extensively about obligations owed to taxing authorities, including obligations he paid in 2013 and 2014. As part of his damages, he also referenced his need to repay Baptiste and Lubwama, as well as his expenditure of $30,000 in legal fees incurred in defending himself before the Board of Bar Overseers with respect to Lipis's presence at the firm.

A. Applicable Law -11 U.S.C. § 523(a)(4)

1. Fiduciary Capacity

As noted above, the Plaintiff's Complaint did not contain separate counts. Accordingly, the Court shall address Hutton's contention that Vasa's obligations to him are nondischargeable under 11 U.S.C. § 523(a)(4) first. Section 523(a)(4) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—. . .
>> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

11 U.S.C. § 523(a)(4). A creditor objecting to the dischargeability of a debt bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in section 523(a). Grogan v. Garner, 498 U.S. 279, 286–91 (1991).

Defalcation for purposes of § 523(a)(4) requires the existence of a trust or fiduciary relationship between the parties at the time the debt was created.  Krischer v. Gibson (In re Gibson), 521 B.R. 645, 656 (Bankr. W.D. Wis. 2014).  Federal law controls whether there is a fiduciary relationship and whether a defendant has acted in a fiduciary capacity within the meaning of § 523(a)(4), although state law determines whether the requisite trust relationship exists.  Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996).

Although the parties referred to themselves as "partners," they also insisted that they did business as sole shareholders of a professional corporation.  Under Massachusetts law, shareholders of closely held corporations owe heightened fiduciary duties to one another.  Connolly v. Fincke (In re Access Cardiosystems, Inc.), 404 B.R. 593, 677 (Bankr. D. Mass. 2009), aff'd, 488 B.R. 1 (D. Mass. 2012), aff'd, 776 F.3d 30 (1st Cir. 2015). "The heightened duties owed under Massachusetts law among shareholders of a close corporation are "derived from the strict standard of behavior applied to partnerships." Id. at 677-78 (citing O'Brien v. Pearson, 449 Mass. 377, 868 N.E.2d 118, 125 (2007)).[6]  In

---

[6]  In Boyer v. Bowles, 310 Mass. 134, 37 N.E.2d 489 (1941), the Supreme Judicial Court summarized the characteristics of a partnership as follows:

A partnership is an association of two or more persons to carry on as co-owners a business for profit. . . .  There must be a voluntary contract of association for the purpose of sharing the profits and losses, as such, which may arise from the use of capital, labor or skill in a common enterprise, and an intention on the part of the principals to form a partnership for that purpose. Mitchell v. Gruener, 251 Mass. 113, 123, 146 N.E. 252, 255. Seemann v. Eneix, 272 Mass. 189, 194, 172 N.E. 243. See Beatty v. Ammidon, 260 Mass. 566, 576, 157 N.E. 702. Subject to any agreement between partners, each shall share equally in the profits, and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits. Lavoine

Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006), this Court

observed:

> Fiduciaries, such as Farley and Romano were to each other [50%
> shareholders of a closely held corporation], are prohibited from engaging
> in self dealing. According to the court in Charlette v. Charlette Bros.
> Foundry, Inc., 59 Mass. App. Ct. 34, 43, 793 N.E.2d 1268 (2003), "[s]etting
> one's own level of compensation, without corporate approval, is a form of
> self-dealing, which is subject to close scrutiny by the court." *See also*
> Crowley v. Communications for Hosps., Inc., 30 Mass. App. Ct. 751, 757–
> 758, 573 N.E.2d 996 (1991); Geller v. Allied–Lyons PLC, 42 Mass. App. Ct.
> 120, 122–123, 674 N.E.2d 1334 (1997).

In re Romano, 353 B.R. at 759.[7]

In Baker v. Friedman (In re Friedman), 298 B.R. 487, 498-99 (Bankr. D. Mass. 2003),

this Court addressed the issue of whether one law partner was a fiduciary to another for

purposes of § 523(a)(4).  This Court stated:

---

> v. Casey, 251 Mass. 124, 127, 146 N.E. 241. *See* Kavanaugh v. Johnson, 290
> Mass. 587, 596, 195 N.E. 797.

Boyer, 310 Mass. at 138, 37 N.E.2d at 492 (internal quotations omitted).

[7] This Court also noted:

> In Bessette v. Bessette, 385 Mass. 806, 434 N.E.2d 206 (1982), the Supreme
> Judicial Court determined that "if a majority stockholder receives
> corporate cash distributions and a salary in excess of the reasonable value
> of services rendered, the right to recover the overpayments belongs to the
> corporation." 385 Mass. at 809, 434 N.E.2d 206. It explained that the
> fiduciary duty underlying a claim for excessive compensation is owed to
> the corporation and can only be asserted as a stockholders' derivative
> action. Id. at 809–10, 434 N.E.2d 206.

In re Romano, 353 B.R. 738, 759 (Bankr. D. Mass. 2006).

Although the First Circuit has not specifically ruled on the issue of whether a partner is a fiduciary, decisions from other circuits and from the bankruptcy court in this circuit are instructive.

*** 

The Seventh Circuit in <u>Frain</u> [230 F.3d 1014 (7th Cir. 2000)] "defined a fiduciary relationship under § 523(a)(4) as 'a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter.'" <u>Id.</u> at 1017 (quoting <u>In re Marchiando</u>, 13 F.3d 1111, 1116 (7th Cir. 1994)). With respect to Frain's conduct, it stated that his superior knowledge of day-to-day operations was insufficient in itself to establish a position of ascendancy. It found, however, that the concentration of power in the corporation was substantially one-sided, that the shareholder agreement was structured to give Frain ultimate power over both his own employment and the direction of the corporation, that the only real limit on his power was the chance of a deadlock, and that no major decision could be made without Frain's agreement, including his own termination. <u>Id.</u> at 1017–18. The court concluded that "a fiduciary relationship was created by the structure of the corporation under the shareholder agreement," rejecting Frain's contention that the violation a contract entered into among equals was not covered by § 523(a)(4). Summarizing its holding, the court stated: "A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over [the minority shareholders]." <u>Id.</u> at 1018.

<u>In re Friedman</u>, 298 B.R. at 497-98.  This Court further observed:

In Massachusetts, partners occupy a trust relation toward each other and are bound to exercise the utmost good faith toward each other. <u>Hawkes v. First Nat'l Bank of Greenfield</u>, 264 Mass. 538, 543, 163 N.E. 246 (1928). Further, the standard of duty owed by partners to one another is one of utmost good faith and loyalty. <u>Cardullo v. Landau</u>, 329 Mass. 5, 8, 105 N.E.2d 843 (1952).

<u>In re Friedman</u>, 298 B.R. at 498 (citing <u>Bane v. LeRoux (In re Curran)</u>, 157 B.R. 500, 509-510 (Bankr. D. Mass. 1993).

2. Defalcation

The United States Supreme Court interpreted the term "defalcation" for

purposes of § 523(a)(4) in Bullock v. BankChampaign, N.A., __ U.S. __, 133 S.Ct.

1754 (2013).  It was asked the following question as to the meaning of defalcation:

> to decide whether the bankruptcy term "defalcation" applies "in the
> absence of any specific finding of ill intent or evidence of an ultimate loss
> of trust principal." . . . The lower courts have long disagreed about whether
> "defalcation" includes a scienter requirement and, if so, what kind of
> scienter it requires. Compare In re Sherman, 658 F.3d 1009, 1017 (9th Cir.
> 2011) ("defalcation" includes "even innocent acts of failure to fully account
> for money received in trust" (internal quotation marks and brackets
> omitted)), with In re Uwimana, 274 F.3d 806, 811 (4th Cir. 2001) (defalcation
> occurs when "negligence or even an innocent mistake . . . results in
> misappropriation"), with 670 F.3d, at 1166 ("defalcation requires ... conduct
> [that] can be characterized as objectively reckless"), and with In re Baylis,
> 313 F.3d 9, 20 (1st Cir. 2002) ("defalcation requires something close to a
> showing of extreme recklessness").

Id. at 1758.  The Supreme Court, based upon its precedent, Neil v. Clark, 95 U.S. 704, 709

(1878), determined the following:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or
> other immoral conduct, the term requires an intentional wrong. We include
> as intentional not only conduct that the fiduciary knows is improper but
> also reckless conduct of the kind that the criminal law often treats as the
> equivalent. Thus, we include reckless conduct of the kind set forth in the
> Model Penal Code. Where actual knowledge of wrongdoing is lacking, we
> consider conduct as equivalent if the fiduciary "consciously disregards" (or
> is willfully blind to) "a substantial and unjustifiable risk" that his conduct
> will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c),
> p. 226 (1985). See id., § 2.02 Comment 9, at 248 (explaining that the Model
> Penal Code's definition of "knowledge" was designed to include "'wilful
> blindness'"). That risk "must be of such a nature and degree that,
> considering the nature and purpose of the actor's conduct and the
> circumstances known to him, its disregard involves a *gross deviation* from
> the standard of conduct that a law-abiding person would observe in the
> actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). *Cf.* Ernst & Ernst
> v. Hochfelder, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)

(defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

Bullock v. BankChampaign, N.A., 133 S. Ct. at 1759-60.

B. Analysis - - 11 U.S.C. § 523(a)(4)

The issue confronting the Court is whether Hutton established a debt arising from fraud or defalcation while Vasa was acting in a fiduciary capacity. Hutton and Vasa were not partners, per se. Rather, they were equal shareholders in a professional corporation which they contemplated dissolving in 2013. Nevertheless, they referred to themselves as partners, and this Court concludes, based upon the authorities cited above, that either as equal shareholders of a closely held Massachusetts corporation or as partners they owed each other fiduciary duties and that Vasa was acting in a fiduciary capacity with respect to his duties as the overseer of both the IOLTA and business bank accounts of V & H. See In re Access Cardiosystems, Inc., 404 B.R. at 677-78; In re Friedman, 298 B.R. at 498-99 (citing Bane v. LeRoux (In re Curran), 157 B.R. 500, 509-510 (Bankr. D. Mass. 1993)).

Pursuant to the parties' course of dealing, Vasa was primarily responsible for the firm's business operations and exerted almost total control over the financial affairs of V & H. While not inaccessible, the location of the check books did not invite ready access by Hutton, as they were located in an unlocked safe next to Vasa's desk. Moreover, only Vasa had the ability to transfer funds online from the IOLTA account to the business operating account. Although he informed Hutton that the firm was unable to pay its tax obligations in 2011 and was experiencing financial difficulties, his superior knowledge of the firm's finances and online access to the accounts enabled him to withdraw substantial

funds from the firm in 2012 at a time when Hutton deferred receipt of income. Hutton had access to the firm's bank accounts but relied upon Vasa to competently manage them, including maintaining sufficient funds in the IOLTA account to issue settlement checks to the firm's clients, such as Baptiste and Lubwama. The IOLTA account was a trust account for the firm's clients; it also was in the nature of a trust res for purposes of § 523(a)(4). Because Vasa and Hutton owed one another fiduciary duties and Vasa was able to transfer monies from the IOLTA account to the firm's business account on a monthly basis to fund the firm's operations, the Court concludes that the firm's operating account, whose funds primarily were derived from monies in the IOLTA account, was imbued with the same trust characteristics as the IOLTA account.

Having established that Vasa was acting in a fiduciary capacity, the question remains whether the evidence warrants a finding of defalcation. This Court concludes that Vasa's conduct involved "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." Bullock, 133 S.Ct. at 1757.

The manner in which Vasa transferred funds from the IOLTA account to the business operating account establishes that Vasa acted in a grossly reckless fashion with respect to the funds in those two accounts. His "reverse reconciliation" system was flawed, sloppy, and virtually guaranteed to produce errors. Adherence to accounting principles and rules for maintaining trust accounts and inter-office communications by email or otherwise to ascertain the status and location of files could easily have avoided the harm caused by Vasa's cavalier approach to online transfers from the IOLTA account to the business account based upon his rough calculations. As a practicing attorney,

licensed in the Commonwealth of Massachusetts, Vasa is charged with knowledge of the duties incident to accounting for IOLTA accounts. His "reverse reconciliation" was reckless and constituted a defalcation while acting in a fiduciary capacity. Vasa is labile to Hutton for any obligations owed to Baptiste and/or Lubwama due to his derelictions in properly maintaining the IOLTA account.

In addition, Vasa defalcated in his fiduciary duty to Hutton with respect to accounting for the firm's profits and losses. The evidence established that Vasa and Hutton agreed to share profits. It further established that the firm experienced financial difficulties in 2011 and 2012 as Cohen testified to receipt of a notice regarding unpaid tax obligations and both he and Hutton testified to the urgent need to meet with the IRS in October of 2012 due to unpaid taxes. There was no evidence, however, that there were profits to share after payments to Lipis for the purchase of the personal injury practice, rent, employees' salaries, and other business expenses. The nonpayment of tax obligations suggests the firm either was experiencing serious cash flow problems or was insolvent. Because Vasa withdrew $63,000.00 from the firm in 2012, while Hutton only withdrew $3,000.00, the Court infers that the income Vasa took from the firm was at the expense of the firm's clients and creditors and constituted a defalcation with respect to Hutton, as Hutton has been assessed with and ordered to pay outstanding tax obligations.

That said, there are significant issues as to the damages suffered by Hutton as a result of Vasa's defalcation which remain unliquidated at this time. In this Court's view, Hutton's damages are either 1) his entitlement to his share of the firm's profits which

25

Vasa distributed to himself, **or** 2) obligations for which Hutton is personally liable, such as unpaid federal and state trust fund taxes and clients' judgments for unpaid settlement amounts, incurred by virtue of Vasa's defalcation.  As noted above, there was no evidence that the firm made any profits in 2011 and 2012, due to the existence of outstanding tax obligations to the MDOR and the IRS.  With respect to the MDOR, the Notice of Lien issued by the Department of Unemployment Assistance revealed that approximately $69,634.68 was due from the third quarter of 2006 through second quarter of 2012 (excluding penalties of $125.00 added to the lien in 2014 and 2015).  The Court concludes that Hutton established that Vasa committed a defalcation with respect to nonpayment of those obligations due to his decision to withdraw approximately $60,000.00 from the firm.  Alternatively, Vasa committed a defalcation by recklessly avoiding payments of tax obligations for which both he and Vasa would be personally liable.  Accordingly, Vasa is liable to Hutton for defalcation while acting as a fiduciary with respect to monies Hutton personally spent to pay tax or other obligations for 2011 and 2012.  As there was no evidence of any defalcation prior to 2011, the Court excludes those years, and, for the reasons set forth below, the Court also excludes taxes owed after 2012 as they did not arise out of a defalcation while acting in a fiduciary capacity.

With respect to the dischargeability of any debt arising after 2012, the Court concludes that Hutton failed to sustain his burden of proof.  Hutton testified that after receiving a phone call from Cohen in late October of 2012 he began to investigate Vasa's handling of the firm's finances, determining that the firm's bank records were in disarray.  At that point, it was incumbent upon him to make sure that taxes were paid before either

he or Vasa took any monies from the firm.  Moreover, Vasa and Hutton began exploring

dissolution of the firm and allocation of liabilities in 2013.  Therefore, in substance, if not

in form, Vasa and Hutton, either as shareholders of the professional corporation known

as Vasa & Hutton, P.C., or as partners, ceased to stand in the same relation to one another.

Having adopted adversarial roles, the notion that Vasa could have repeatedly and

continually breached fiduciary duties to Hutton is unsupported by the evidence or

common sense, particularly where the parties began communicating through attorneys

and Hutton testified that there was no point in even speaking with Vasa. Under those

circumstances, any tax payments made by Hutton after 2012 cannot be attributed to any

continuing breach of fiduciary duty by Vasa.  Once Hutton discovered Vasa's conduct in

withdrawing monies from the firm while simultaneously failing to satisfy tax obligations,

it became his responsibility to insure that tax obligations for which he might be personally

be liable were paid, particularly where the firm's finances appeared to be in shambles

and each partner was exploring other avenues of employment.  At that time, the fiduciary

duties owed by Vasa and Hutton to each other flowed to the firm's creditors, not to one

another.  *See* In re Romano, 353 B.R. at 763.  In other words, armed with knowledge that

Vasa had failed to pay tax obligations in 2012, Hutton cannot attribute nonpayment of

tax obligations to Vasa's defalcation while acting in a fiduciary capacity.  Accordingly, to

the extent Hutton seeks to except any contribution claim for tax or other obligations of V

& H for which he might be personally liable from Vasa's discharge under § 523(a)(4) after

2012, he failed to sustain his burden of proof.

27

C. <u>Applicable Law- -11 U.S.C. 523(a)(2)(A)</u>

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The Bankruptcy Appellate Panel in <u>Bellas Pavers, LLC. v. Steward (In re Stewart)</u>, No. MB 12-07, 2012 WL 5189048 (B.A.P. 1st Cir. Oct. 18, 2012), observed that "[t]o establish that a debt is nondischargeable under this section, a creditor must prove actual fraud, rather than mere fraud implied in law." 2012 WL 5189048, at *7 (citing Lawrence P. King, 3 Collier on Bankruptcy ¶ 523.08[1] (15th ed. rev. 2002)).  In <u>McCrory v. Spigel (In re Spigel)</u>, 260 F.3d 27 (1st Cir. 2001), the United States Court of Appeals for the First Circuit set forth the elements of actual fraud which must be established to sustain a claim under § 523(a)(2)(A) as follows:

> (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;
>
> (2) the debtor intended to deceive;
>
> (3) the debtor intended to induce the creditor to rely upon the false statement;
>
> (4) the creditor actually relied upon the misrepresentation;
>
> (5) the creditor's reliance was justifiable; and
>
> (6) the reliance upon the false statement caused damage.

<u>Id.</u> at 32 (citing <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir. 1997)).

D. Analysis - - 11 U.S.C. § 523(a)(2)(A)

In 2011 and 2012, the firm's finances were precarious and unsound. In 2011, according to Hutton, Vasa induced him to loan money to the firm. Then, in 2012, Vasa improperly withdrew substantial sums for the purpose of compensating himself while Hutton refrained from taking more than $3,000.00 in income. There are substantial problems with Hutton's count under § 523(a)(2)(A) with respect to Hutton's personal loan to the firm. In the first place, it was not a loan to Vasa, but a loan to V & H. In the second place, there was no evidence that Vasa personally promised to repay the loan, and Hutton testified that he did not rely on Vasa's statement that he needed to take out a personal loan so that money could accumulate in the firm for the payment of taxes; rather he relied on Vasa's $10,000.00 loan to the firm in 2009. Finally, when Vasa testified that he did not recall any conversation about a personal loan from Hutton to V & H, the burden shifted to Hutton to establish exactly when he made the loan and to produce a copy of the check or other evidence of an infusion of $50,000.00 in the firm. This Court's review of V & H's operating account and IOLTA account did not yield evidence of a $50,000.00 infusion of funds or the payment by means of a check from the firm's operating account of an obligation in the sum of $50,000.00 to any person or entity. Like Vasa's lack of credibility due to his omissions and misstatement on his Schedules of Assets and Liabilities, the Court finds that Hutton was not credible on this point of contention and rejects his version of the loan transaction.

Thus, the issue is whether Vasa deliberately represented that the firm was on the verge of insolvency to induce Hutton not to take profits so that Vasa could take the profits

for himself.  As noted above, there was no proof by either Hutton or Vasa that the firm actually was profitable during the period in question, and Hutton did not assert any claims for embezzlement.  Rather, the firm was not satisfying its tax obligations. Accordingly, there is no evidence that Vasa incurred a debt to Hutton as a result of a false representation.

### E. Applicable Law - - 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). As the United States Bankruptcy Appellate Panel of the First Circuit observed in O'Rorke v. Porcaro (In re Pocaro), __ B.R. __, 2016 WL 453385 (B.A.P. 1st Cir. Feb. 3, 2016), "[t]o except a debt from discharge under § 523(a)(6), a creditor must show: (1) the debtor injured him or his property; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious."  Id. at *9 (citing Jones v. Svreck (In re Jones), 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003)).  "Willful,' 'modifies the word "injury," meaning that for a debt to be excepted from discharge requires proof of 'a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.'" In re Pocaro, 2016 WL 453385 at * 9 (quoting Kawwaahau v. Geiger, 523 U.S. 57, 61–62 (1998)).  The Supreme Court stated that "[i]ntentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" Geiger, 523 U.S. at 61–62, 118 S.Ct. 974 (citing Restatement (Second) of Torts § 8A). "Thus, a debtor who intentionally acts in a manner he knows, or is substantially certain, will harm another may be considered to have intended the harm and, therefore, to have acted willfully within the meaning of §

523(a)(6)." *See* McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 19 (Bankr. D. Me. 1998)

(quoting Restatement (Second) of Torts § 8A cmt. b Id. (footnote omitted)).

As noted by the panel in Porcaro, prior to the Supreme Court's decision in Geiger,

the United States Court of Appeals for the First Circuit determined that to establish

"malice" for purposes of  § 523(a)(6) required proof that the injury was caused "without

just cause or excuse." 2016 WL 453385 at *9 (quoting Printy v. Dean Witter Reynolds, Inc.,

110 F.3d 853, 859 (1st Cir. 1997)).  Post-Geiger, the Printy standard remains the law in this

circuit with respect to the definition of malice. Id. *See also* Old Republic Nat'l Title Ins.

Co. v. Levasseur (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013) (stating that an injury

is malicious "if it was wrongful and without just cause or excuse, even in the absence of

personal hatred, spite or ill-will") (citation omitted) (internal quotations omitted).

F. Analysis  - - 11 U.S.C. § 523(a)(6)

Hutton contends that his debt for legal fees to defend himself before the Board of

Bar Overseers is excepted from discharge due to Vasa's engagement of Lipis while he

was in Europe.  The Court concludes that the evidence fails to support a finding that Vasa

willfully and maliciously injured Hutton.  Rather, the evidence was overwhelming that

V & H and Hutton favored Lipis as a creditor, timely paying him rent and sums due

relating to the purchase of the legal practice.  Indeed, of the checks Hutton wrote a

significant number of them were to Lipis.  Moreover, it was around the time that Vasa

and Hutton discussed cessation of payments to Lipis that Lipis agreed to accept reduced

payments for his former law practice and suggested settling cases for the firm as a

"volunteer."  Moreover, he represented, untruthfully, that he had permission to perform

31

services for the firm from the Board of Bar Overseers.  Prior to Hutton's travel to Europe,

Cohen, Vasa and Hutton discussed permitting Lipis to "volunteer" at V & H.  Cohen

advised that permitting Lipis to be involved at the firm would create an appearance of

impropriety.  Although Vasa permitted Lipis to work at the firm, there was no evidence

that Hutton performed a modicum of legal research or obtained an opinion from the

Board of Bar Overseers to ascertain the propriety of Lipis's engagement which he should

have done in view of Cohen's opinion that Lipis's employment would create an

appearance of impropriety. In view of that evidence, as well as the evidence that Vasa

also was harmed by the decision to have Lipis at the firm, the Court concludes that

Hutton failed in his burden of proof.  There was insufficient evidence for this Court to

conclude that Vasa intended to injure Hutton by engaging Lipis.  Rather, it would appear

that either Lipis's skills settling cases or something else motivated both Hutton and Vasa

to permit him to work at the firm.  Although Vasa was responsible for Lipis's initial

presence at the firm, there was nothing stopping Hutton from immediately terminating

the relationship when he returned from Europe.

**V. CONCLUSION**

In accordance with the foregoing, the Court shall enter a judgment in favor of

Hutton and against Vasa with respect to Hutton's claim under 11 U.S.C. § 523(a)(4), but

only as to obligations to Baptiste and/or Lubwama and either as to Hutton's share of any

profits from V & H for 2012 or for the amount of unpaid state and federal taxes for 2011

and 2012 that Hutton was personally obligated to pay. The Court shall enter a judgment

in favor of Vasa and against Hutton under 11 U.S.C. § 523(a)(2)(A) and (a)(6).

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  March 8, 2016